[Civ. No. 38224. First Dist., Div. Two. Oct. 27, 1976.]

NICK VERREOS, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants, Cross-defendants and Respondents;
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN
FRANCISCO, Defendant, Cross-complainant and Appellant.

**COUNSEL**

Long & Levit, Victor B. Levit and H. Paul Breslin for Plaintiff and Appellant.

Benjamin D. James, Jr., for Defendant, Cross-complainant and Appellant.

Thomas M. O'Connor, City Attorney, George E. Baglin, Deputy City Attorney, Stephen Warren Solomon, Richard Goldman, Davis, Cowell & Bowe, Duane W. Reno and Roland C. Davis for Defendants, Cross-defendants and Respondents.

## OPINION

**ROUSE, J.**—Plaintiff Nick Verreos, a resident and taxpayer of the City and County of San Francisco, brought a class action on behalf of all other individuals similarly situated, seeking to prohibit the implementation of a strike settlement agreement pursuant to which Mayor Joseph Alioto had agreed to grant San Francisco's policemen and firemen a 13.05 percent raise in salary. Plaintiff sought declaratory and injunctive relief and the issuance of a writ of mandamus and prohibition. The complaint named as defendants the City and County of San Francisco, Mayor Alioto, the Board of Supervisors of the City and County of San Francisco, the municipal controller, the municipal treasurer, the Police Officers Association of the City and County of San Francisco and Local 798 of the International Association of Firefighters.

Plaintiff alleged in his verified complaint that on August 18 and 20, 1975, the two unions representing San Francisco's policemen and firemen commenced illegal strikes which resulted in almost a complete cessation of police and fire protection for the residents and taxpayers of the City and County of San Francisco; that on August 18, 1975, the board of supervisors agreed to offer the policemen and firemen a salary raise of approximately 6.5 percent; that both the policemen and firemen demanded a 13.05 percent raise and commenced illegal strikes to enforce their wage demands; that the superior court, at the request of the City and County of San Francisco, declared the police strike illegal and ordered the policemen to return to work; that Mayor Alioto, acting without the authority of the board of supervisors, negotiated with the two striking unions a settlement which provided for the 13.05 percent raise demanded by the unions; that on August 21, 1975, the board of supervisors unanimously rejected Alioto's settlement proposal and stated that it would not negotiate further with the striking policemen and firemen until they returned to work; that immediately thereafter, Alioto

declared the existence of a state of emergency within the City and County of San Francisco, and pursuant to emergency powers purportedly granted to him under the Charter of the City and County of San Francisco (hereinafter "the charter"), approved the 13.05 percent raise which he had previously negotiated and imposed liability for such raise upon the City and County of San Francisco.

Plaintiff's complaint alleged that Mayor Alioto's conduct in declaring a state of emergency and personally approving the raise in salaries was invalid because section 8.405 of the charter vested sole authority to fix salary rates for policemen and firemen in the board of supervisors. The complaint was subsequently amended, with leave of the court, to raise the following additional grounds for attack upon Mayor Alioto's conduct: (1) no public emergency existed when Alioto declared the state of emergency; (2) section 3.100 of the charter, which purported to grant the mayor emergency powers, was violative of the due process clause; and (3) Alioto acted fraudulently and in bad faith and with the intent to usurp the power of the board of supervisors when he declared the state of emergency and granted the policemen and firemen the raise they had demanded.

Following the issuance of an alternative writ of mandate, the two defendant unions and the City and County of San Francisco filed answers denying the invalidity of Mayor Alioto's actions in declaring the state of emergency and granting the raise in salary to the policemen and firemen.

Defendant board of supervisors filed an answer in which it denied responsibility for the salary raise and further denied that it would take any action to implement same. The board of supervisors also filed a cross-complaint against all the other defendants, joining with the plaintiff in contending that the salary raise granted by Alioto was invalid and that its implementation should be permanently enjoined.

The two defendant unions demurred generally to the complaint and cross-complaint, but the demurrers were overruled.

The two unions then moved for judgment on the pleadings. Thereafter, plaintiff and defendant board of supervisors made certain extensive and detailed written offers of proof which will be alluded to where relevant to the issues raised on appeal.

A hearing was held on the motion for judgment on the pleadings, and, with the acquiescence of the parties, the court ruled that it would treat the motion as one for summary judgment as well as for judgment on the pleadings.

The court rendered a judgment in which it stated that it had considered the offers of proof and the written briefs and oral arguments of the parties and that it had also taken judicial notice of Mayor Alioto's emergency proclamation and a prior resolution by the board of supervisors that an emergency existed in the City and County of San Francisco. The court determined as a matter of law that section 3.100 of the charter was constitutional; that a public emergency within the meaning of that section existed in the City and County of San Francisco on August 21, 1975, when Alioto issued his emergency proclamation; and that Alioto's emergency proclamation was valid. In accordance with this determination, the court rendered judgment on the complaint and cross-complaint in favor of defendants and cross-defendants and against plaintiff and the board of supervisors, and ordered the complaint and cross-complaint dismissed.[1]

Plaintiff and the board of supervisors each filed a timely notice of appeal from the judgment.

■ Before reviewing the merits of the arguments raised on appeal, it seems appropriate to deal with the contention raised by the City and County of San Francisco, its mayor, controller and treasurer (hereinafter collectively referred to as "the city and county"), to the effect that the board of supervisors was not a party aggrieved by the judgment and that its appeal must therefore be dismissed.

In support of this contention, the city and county relies upon *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683]. In

---

[1] On its face, the judgment would appear to be overly broad in scope, since the two defendant unions were the only parties who filed the motion for judgment on the pleadings (which was later treated in the alternative as a motion for summary judgment) and yet the trial court dismissed the complaint and cross-complaint and entered judgment in favor of all defendants and cross-defendants. However, neither plaintiff nor the board of supervisors has raised this point on appeal. The record reveals that a hearing was held in the trial court to settle the form which the judgment should take and the language which it should contain. At said hearing, plaintiff's counsel expressly agreed that in view of the manner in which the court had decided the issues, the judgment should provide for dismissal of the complaint and cross-complaint. Thus, it appears that it was agreed by all of the parties in the trial court that the motion for judgment on the pleadings and summary judgment should be deemed to have been made on behalf of all the defendants.

that case, four San Francisco taxpayers brought suit against the city and county, its board of supervisors and the assessor, seeking a writ of mandate requiring official action in connection with certain actions of the assessor which had caused him to be indicted on multiple counts of criminal misconduct in office. The plaintiffs prevailed in the trial court, which issued a writ of mandate substantially as requested and subsequently issued an order prohibiting the board of supervisors (when sitting as the board of equalization) from considering or adopting any assessment ratio lower than 50 percent in measuring the validity of new assessments.

The City and County of San Francisco, the board of supervisors and the assessor appealed from this order, but the appellate court dismissed the appeal, holding that the appellants were not injuriously affected by the order, which merely set a standard to be followed by appellants in reviewing assessments. The court stated, "If the standard was wrong in the case of any affected taxpayer . . . only that taxpayer can complain: the City and County of San Francisco cannot, the board of supervisors and the board of equalization cannot, the assessor cannot. The question posed by appellants' arguments on this point relate only to the interests (if any) of affected taxpayers. We conclude that the interests of appellants—whatever they might be, even considered severally—are not 'injuriously affected' by the . . . order; for this reason, we dismiss their appeal from it." (Pp. 205-206.)

The city and county contends that the rule of the *Knoff* case is equally applicable here because the board of supervisors' attack upon Mayor Alioto's conduct, both in the trial court and on appeal, can only be viewed as the assertion by the board of a cause of action belonging only to plaintiff and the other San Francisco taxpayers on whose behalf he commenced the instant action. The city and county asserts that the mere fact that the board of supervisors was named as a defendant in the action brought by plaintiff did not entitle it to treat plaintiff's cause of action as its own and attempt by its cross-complaint to join forces with plaintiff in seeking to invalidate Mayor Alioto's conduct. It is likewise clear, according to the city and county, that the board of supervisors, as such, was in no sense aggrieved by the judgment upholding Alioto's actions and that the only parties who are aggrieved by such judgment are plaintiff and the other San Francisco taxpayers whom he represents.

The board of supervisors has not filed a closing brief; however, at oral argument, through their counsel, they persisted in the contention that their cross-complaint is properly brought.

The city and county's reasoning would appear persuasive and in accord with the rule of the *Knoff* case. It seems apparent that the board of supervisors, as such, possesses no right, independent of that belonging to all San Francisco taxpayers, to challenge the validity of Alioto's conduct in granting the salary raise to the policemen and firemen. This conclusion is partially substantiated by the board of supervisors' own opening brief on appeal, which contains the statement that the board is "representing the citizens and taxpayers of San Francisco." We believe that the board is not empowered to undertake such representation, that that right belongs to the taxpayers themselves and that no interest of the board, as such, was injuriously affected by the judgment upholding Alioto's actions. It follows that the board's appeal must be dismissed.

We next consider plaintiff's first contention on appeal, which is that Mayor Alioto's actions in declaring the state of emergency and responding as he did to said emergency are subject to judicial review and involve factual questions which should normally be decided only after a full trial at which evidence is presented.

In *Mullins* v. *Henderson* (1946) 75 Cal.App.2d 117 [170 P.2d 118], the only case involving judicial review of the exercise of emergency powers[2] by the Mayor of San Francisco, a two-week trial was held to resolve the question of whether the action taken by the mayor pursuant to the emergency powers granted him by the charter was justified by the conditions existing at the time. The trial court found that the action taken by the mayor was proper in all respects and this determination was upheld on appeal. The appellate court held that the question of whether the existing conditions shown by the evidence justified the action taken by the mayor in the exercise of his emergency powers was one of fact to be decided by the trial court. (P. 121.)

In this action, plaintiff contends that he should have been accorded a trial. Defendants, on the other hand, take the position that all of the questions raised by the complaint could properly be decided by the trial court as a matter of law, based upon the allegations of the verified

---

[2]When the *Mullins* case was decided the charter provision vesting the mayor with emergency powers was section 25. That section has since been recodified as section 3.100.

complaint and certain documents judicially noticed by the court. In order to determine the merits of the parties' respective contentions, it is necessary to discuss, in order, the various issues decided by the trial court.

The first issue decided by the trial court was the constitutionality of section 3.100 of the charter. This question was obviously one which could be decided solely as a matter of law, and all of the parties so stipulated in open court at the trial. However, plaintiff contends that the court erred in upholding the validity of the section. He asserts that section 3.100 is unconstitutionally vague and overbroad because it provides that "In case of [a] public emergency . . . the mayor shall have the power . . . to do whatever else he m. y deem necessary for the purpose of meeting the emergency."[3] According to plaintiff, the fatal flaw in this provision is that it contains no language limiting the mayor's unfettered discretion or imposing any objective standard against which his actions must be measured. Plaintiff suggests that the challenged portion of section 3.100 would permit the mayor, in the exercise of his emergency powers, to take such drastic steps as tripling the salaries of public employees, doubling the number of such employees, jailing the members of the board of supervisors, declaring a state of martial law or suspending the provisions of the Bill of Rights.

The difficulty with plaintiff's argument is that he has chosen to ignore the settled rule that statutes must be given a reasonable interpretation and that a literal construction which will lead to absurd results will not be given if it can be avoided. (*Dempsey* v. *Market Street Ry. Co.* (1943) 23 Cal.2d 110, 113 [142 P.2d 929].)　In *Mullins* v. *Henderson, supra,* the appellant challenged the emergency powers provision of the San Francisco Charter on the same ground as that raised by plaintiff in this case, questioning the breadth of the emergency powers granted to the mayor. The appellate court found no difficulty in rejecting such argument and construing the section in a manner which would lead to reasonable rather than absurd results. The court there observed that, "The charter was prepared by a board of freeholders elected by the people of the city, and afterwards adopted by the voters of the city, and

---

[3]Section 3.100, in pertinent part, reads as follows: "In case of a public emergency involving or threatening the lives, property or welfare of the citizens, or the property of the city and county, the mayor shall have the power, and it shall be his duty, to summon, organize and direct the forces of any department in the city and county in any needed service; to summon, marshal, deputize or otherwise employ other persons, or to do whatever else he may deem necessary for the purpose of meeting the emergency."

any of its provisions may be changed at any time by the voters. It is not, however, within the power of the courts to amend, revise or rewrite any portion of the charter. Of course the exercise of the emergency powers by the mayor must be reasonable and must be invoked only to protect the lives, property or welfare of the citizens or the property of city and county, and then only when such an emergency actually exists; and the emergency action of the mayor is always subject to judicial review." (Pp. 134-135.) The *Mullins* court also noted that the word "emergency," as used in the charter provision, meant " 'an unforeseen occurrence or combination of circumstances which calls for immediate action or remedy.' " (P. 127.)

The reasoning of the *Mullins* case is dispositive of plaintiff's constitutional challenge to section 3.100. Since that section grants broad powers to the mayor only under unusual circumstances calling for immediate action and since the mayor's actions under the section must be reasonable and are subject to judicial review, we conclude that the section fully comports with the requirements of the due process clause.

 Plaintiff next contends that the trial court erred in determining that Alioto's emergency proclamation was properly issued pursuant to section 3.100. Plaintiff asserts that section 8.405 of the charter vests in the board of supervisors the exclusive power to determine salaries for policemen and firemen, that section 2.101 of the charter declares that all powers of the city except those specifically delegated to other officials are vested in the board of supervisors, and that nowhere in the charter is the mayor given any authority over legislative matters. Plaintiff also points out that section 9.108 of the charter refers to "ordinances necessary to enable the mayor to carry out any of the powers vested in him in the case of a public emergency" and provides that such ordinances shall not be subject to referendum. He argues that it is evident from a reading of these various provisions that in any situation calling for the exercise of legislative, as opposed to executive, powers, the mayor may act only with the concurrence of the board of supervisors and that this is true even in the case of an emergency. It is plaintiff's position that section 3.100 must be interpreted in such a manner as to render it consistent with the other above quoted sections of the charter, and that, when so construed, it did not authorize Mayor Alioto to invade the legislative sphere and put into effect a salary raise which the board of supervisors had unanimously rejected. In further support of this contention, plaintiff asks that this court take judicial notice of the fact that in November 1975, the San

Francisco voters overwhelmingly passed Proposition N, which amended section 3.100 of the charter to provide that the mayor, in declaring and meeting a public emergency, shall act only with the concurrence of the board of supervisors. Plaintiff argues that the enactment of Proposition N should be viewed as a legislative clarification which may properly be considered in determining the legislative intent behind the enactment of section 3.100 in its original form.

We are unable to accept plaintiff's contention that section 3.100, when read in conjunction with the other pertinent sections of the charter, did not vest the mayor with legislative powers. This argument is not a new one, and here again, the reasoning of *Mullins* v. *Henderson, supra,* is controlling. In that case, the appellant likewise relied upon the charter provision referring to emergency ordinances and providing that they should not be subject to referendum, contending that the mayor's emergency powers could only be put into effect through ordinances enacted by the board of supervisors. The appellate court held that the provision in question "merely provides for expeditious passage of such ordinances as may be necessary to enable the mayor to carry out the emergency powers vested in him . . . *but that it does not require any ordinance or resolution to be passed.*" (P. 128; italics added.)

With regard to the plaintiff's contention that the charter provision vesting the mayor with emergency powers should be interpreted in a manner consistent with the other charter provisions vesting power to legislate and to determine salaries solely in the board of supervisors, the *Mullins* court stated, "While it is true that, ordinarily, specific provisions in a charter will supersede general ones, it is self-evident from the very broad language of [present section 3.100] that it was intended to prevail, in an emergency, over the provisions of the charter written for ordinary times; that otherwise the concluding paragraph of [section 3.100] would be meaningless. In other words, although the power to fix the compensation of municipal employees is vested in the board of supervisors, these powers, by the broad terms of [section 3.100] may be suspended in an emergency. None of the cases cited and relied on by appellant, holding that the board of supervisors has exclusive power to fix salaries, involved an emergency." (P. 132.)

The *Mullins* case thus disposes of all the arguments marshalled by plaintiff in support of his suggested construction of section 3.100 except for his reliance upon the passage of Proposition N as indicating the intent behind the original enactment of section 3.100. This argument is

wholly without merit. ■ It is a settled principle of statutory construction that a material change in the language of a legislative enactment is ordinarily viewed as showing an intent on the part of the Legislature to change the meaning of the statute. (*W. R. Grace & Co.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 720, 729 [151 P.2d 215]; *Farmers Ins. Exch.* v. *Geyer* (1967) 247 Cal.App.2d 625, 634 [55 Cal.Rptr. 861].) The courts will not infer that the Legislature intended only to clarify the law unless the nature of the amendment clearly demonstrates that this is the case (*Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 770 [114 Cal.Rptr. 571]) or the Legislature itself states in a particular amendment that its intent was to be declaratory of the existing law. (*Redevelopment Agency* v. *Pacific Vegetable Oil Corp.* (1966) 241 Cal.App.2d 606, 612 [50 Cal.Rptr. 676].)

■ It is also the rule that an amendment materially changing a statute following a court decision interpreting the statute in its original form is to be regarded as an indication of legislative intent to change the meaning of the law. (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231-232 [273 P.2d 5].)

■ Finally, where the language of a statute is clear and unambiguous, amendments thereto will not be considered by the courts in determining its meaning. (*Farmers Ins. Exch.* v. *Geyer, supra,* at pp. 633-634.)

■ When these rules are applied to section 3.100 of the charter, no conclusion is possible but that said section, in its original form, is entirely free from ambiguity and was properly interpreted in *Mullins* v. *Henderson, supra*; that Proposition N was not intended merely to clarify the preexisting law, but rather to effect a material change in section 3.100 so as to require that, in the case of future emergencies, the concurrence of the board of supervisors would be required before the mayor could act to meet such emergencies.

■ Plaintiff next contends that the trial court erred in determining that as a matter of law, a public emergency existed within the City and County of San Francisco on the day when Mayor Alioto issued his emergency proclamation and that said proclamation granting the salary raise to the policemen and firemen was valid.

In evaluating this contention, we must note at the outset that the procedure utilized by the trial court in deciding the issues raised by the

complaint as a matter of law, and without the taking of any evidence, was a highly unusual one. Although the court ruled, with the acquiescence of the parties, that it would treat the motion before it as one for both judgment on the pleadings and for summary judgment, it is apparent that the court was not in fact following the procedural requirements of either such motion.

A motion for judgment on the pleadings is in the nature of a general demurrer which looks only to the legal sufficiency of the allegations of the pleading under attack. (*MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 812-813 [161 P.2d 449]; *Wilson* v. *Board of Retirement* (1957) 156 Cal.App.2d 195, 200 [319 P.2d 426].) A motion for summary judgment, on the other hand, must be based upon affidavits by the moving party which contain uncontroverted factual averments establishing his right to judgment. (Code Civ. Proc., § 437c; *Callahan* v. *Chatsworth Park, Inc.* (1962) 204 Cal.App.2d 597, 600, 604-605 [22 Cal.Rptr. 606]; *Gardenswartz* v. *Equitable etc. Soc.* (1937) 23 Cal.App.2d Supp. 745, 751 [68 P.2d 322].)

In this instance, the trial court did not confine itself to a consideration of the pleadings alone; in fact, a general demurrer to plaintiff's complaint had previously been overruled. Hence, it is apparent that the court did not grant judgment on the pleadings. Neither can the procedure utilized by the court be likened to the granting of summary judgment, since there were no affidavits of any kind filed by the moving parties.

Accordingly, it appears inappropriate to review the trial court's decision in accordance with the rules governing either a motion for judgment on the pleadings or a motion for summary judgment. What the court, in fact, considered in reaching its decision was explained by the trial judge in open court. He stated that in making his determination that an emergency existed as a matter of law at the time of the mayor's declaration, he had taken into consideration the following facts which were before the court by judicial notice or otherwise: an illegal strike by public employees was in progress; the striking employees were violating certain orders of the superior court and both the board of supervisors and the mayor had separately proclaimed the existence of an emergency. The trial judge further stated that, in determining that the actions taken by the mayor in response to the emergency were valid, he had considered nothing other than the fact that the mayor had ended the

strike by settling with the striking policemen and firemen. The court stated, "I never considered any evidence about anything." The question before us is whether the court was correct in limiting its review in this manner and, in particular, whether it ought to have given at least some consideration to plaintiff's various offers of proof.

Defendants contend that the court's determination that an emergency existed as a matter of law at the time of the mayor's declaration must be upheld because such cases as *Clunie* v. *Siebe* (1896) 112 Cal. 593, 597-598 [44 P. 1064], and *Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 420 [84 P.2d 1034], stand as authority for the proposition that the courts may not question the judgment of either the legislative or executive department of governments relative to the wisdom, expediency or necessity of any given law. However, defendants concede that the applicability of this rule was limited, in *San Christina etc. Co.* v. *San Francisco* (1914) 167 Cal. 762, 769 [141 P. 384], to the determinations of the general Legislature of the state and not to inferior legislative tribunals such as the City and County of San Francisco. The court in the *San Christina* case held that when the power or jurisdiction of such inferior tribunal is made to depend upon the existence of a particular fact, its determination of the existence of the fact was not conclusive upon the courts unless it was declared to be so in express terms or by necessary implication. (Pp. 769-770.) The court further held that a San Francisco Charter provision which authorized the board of supervisors to deviate from a monetary limit on tax levies "in case of any great necessity or emergency" clearly did not render the board's finding as to the existence of such great emergency or necessity conclusive. The court stated, "Manifestly it does not. The language of the charter is not that the dollar limit may be suspended upon the declaration of the supervisors that a great emergency or necessity exists. It is that this limit may be suspended 'in case of' (the existence of) 'any great necessity or emergency.' " (P. 772.) The court concluded that the determination of the board of supervisors as to the existence of a great necessity or emergency was subject to review.

▪ It is apparent that section 3.100 of the charter, which vests the mayor with emergency powers, is subject to the same analysis, since it contains the identical language "in case of" a public emergency. Under the reasoning of the *San Christina* case, this language means that the mayor is empowered to exercise emergency powers only when an emergency *in fact* exists; that the existence of an actual emergency is a question to be determined by the court; and that if no such emergency did exist, the exercise of the mayor's emergency powers was invalid and

it is of no moment that he may have erroneously declared a state of emergency under the good faith but mistaken belief that one existed. Hence, there is no merit to defendants' contention that the mayor's determination as to the existence of an emergency was not subject to judicial review. The court so held in *Mullins* v. *Henderson, supra.*

Defendants contend, however, that both the *San Christina* and *Mullins* holdings were based upon the rule, espoused in *San Christina,* that a different rule of review applies to inferior legislative tribunals than to the general Legislature. Defendants contend that this distinction has been rejected by our Supreme Court in two recent cases, *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721 [119 Cal.Rptr. 631, 532 P.2d 495], and *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403].

A reading of the two decisions reveals that, in each instance, the court held that a legislative act could not be nullified because, in the opinion of the court, it was the result of improper considerations and subjective motivations on the part of the legislators. The court further held that this rule applied to local legislation and not just to legislation on the state level. However, the court in *County of Los Angeles* v. *Superior Court, supra,* took pains to distinguish the *San Christina* case and one of its progeny, *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247], on the ground that they were simply inapposite and had merely upheld the right of the courts to determine whether local legislators had complied with the charter's mandate. (*County of Los Angeles* v. *Superior Court, supra,* at p. 727, fn. 5.)

We are here concerned, not with the subjective motives of the mayor, but with the question of whether there was compliance with the charter requirement that an emergency exist before the mayor could exercise extraordinary emergency powers. Under the rule of the *San Christina* and *Mullins* cases, the question of whether an emergency did exist was most certainly subject to judicial review.

Contrary to the assertions made by defendants, none of the cases involving judicial review of emergency proclamations made under the San Francisco Charter indicate that such a proclamation can only be nullified upon a showing that it was fraudulent or so palpably unreasonable or arbitrary as to constitute an abuse of discretion as a matter of law.

In the *San Christina* case, the situation was one where the trial court had sustained, without leave to amend, a demurrer to a complaint wherein the plaintiff had sought to invalidate a tax levy enacted in 1910 by the San Francisco Board of Supervisors pursuant to a declaration of the existence of a great necessity or emergency based upon the 1906 earthquake and fire. The Supreme Court held that the demurrer should have been overruled and the plaintiff given an opportunity to prove at a trial that no great necessity or emergency in fact existed at the time of the declaration. The court did not comment upon the plaintiff's burden of proof or the type of evidence which he would be required to present at the trial, although the court did note that an emergency was a situation calling for immediate action and that the supervisors could not foster and nurse the 1906 emergency so as to spread their taxing power over an undetermined number of years. (P. 773.)

*Josselyn* v. *San Francisco* (1914) 168 Cal. 436 [143 P. 705], the first case to follow *San Christina,* likewise sheds no real light on the type of proof required to invalidate an emergency declaration. In *Josselyn,* the trial court found that no great necessity or emergency existed when the San Francisco Board of Supervisors so declared. The Supreme Court applied the *San Christina* rule that the question was one of fact and held that since the defendant was not challenging the sufficiency of the evidence in support of the trial court's finding, "[w]e must assume that such finding is amply supported by evidence . . . ." (P. 441.)

In *Burr* v. *San Francisco* (1921) 186 Cal. 508 [199 P. 1034, 17 A.L.R. 581], the question before the court was again the validity of a tax levy enacted after the board of supervisors had declared the existence of a great necessity or emergency. The trial court upheld the validity of the tax levy, apparently finding that a decrease in municipal income and an increase in essential municipal expenses justified the board's finding of great necessity and emergency. The Supreme Court reversed, holding that, as a matter of law, great necessity and emergency did not exist merely because the city's expenses had increased to a point where they could not be met without exceeding the dollar tax limit contained in the charter.

*Spreckels* v. *San Francisco* (1926) 76 Cal.App. 267 [244 P. 919], like the *San Christina* case, involved a challenge to the board of supervisors' enactment of tax levies in 1910, based upon a finding of great necessity or emergency caused by the 1906 earthquake and fire. While in *San Christina,* the Supreme Court held that the plaintiff was entitled to a trial

and that the demurrer to his complaint should have been overruled, the *Spreckels* case proceeded to trial and the plaintiff recovered judgment based upon the trial court's determination that there was, in fact, no great necessity or emergency in 1910. The appellate court upheld the judgment, on the basis that a finding that a great necessity or emergency presently existed could not be based upon conditions which were ascertained or ascertainable two years earlier. The appellate court commented on the rules governing the trial court in reviewing the board's emergency resolution: "While it will be assumed *prima facie* that the board acted upon sufficient inquiry [citations], and the burden rested upon [respondent] to show either that the facts found were untrue or that the conclusions therefrom were unsupported [citations], its determinations were not conclusive but subject to review [citation].

"The evidence in the instant case was without conflict, and the findings rest upon inferences drawn from the declarations of the board, together with circumstances judicially noticed; and though the facts would support inferences favorable to appellant, those drawn by the court also find reasonable support therefrom. They fairly overcome the presumptions mentioned, and sustain the conclusion that no necessity or emergency within the meaning of the charter was shown. Where fair and impartial minds may draw different conclusions from the evidence though there be no conflict therein, the conclusions drawn by the trial court must be sustained on appeal [citations]." (P. 275.)

Finally, in *Mullins* v. *Henderson, supra,* which we have already discussed at some length, the court reaffirmed the rule expressed in the *San Christina, Josselyn* and *Spreckels* cases, namely, that the question of whether the existing conditions justified the action taken by the mayor in the exercising of emergency powers was one of fact to be determined by the trial court. (P. 121.) The *Mullins* court further held that the exercise of emergency powers by the mayor must be "reasonable," could be invoked only to protect the lives, property or welfare of the citizens or the property of the city and county, "and then only when such an emergency actually exists . . . ." (Pp. 134-135.)

These cases contain no mention of any requirement that an emergency proclamation, in order to be nullified, must be fraudulent or palpably unreasonable or arbitrary. What the cases do establish is that the trial court must determine for itself, based upon the evidence presented, whether an actual emergency existed at the time of the declaration.

In this instance, as has been noted, the trial court's determination of the existence of an actual emergency was based upon its review of the pleadings and upon the following facts which it had judicially noticed: an illegal strike by public employees was in progress; the strikers were violating certain orders of the superior court; and a state of emergency had been declared by both the board of supervisors and the mayor.

The declarations of emergency by the mayor and the board of supervisors could not, in and of themselves, justify the court's determination, as a matter of law, that an actual emergency then existed. The city and county so conceded during oral argument before this court. Under the line of cases which we have just discussed at length, the trial court was required to make a factual and objective determination whether an actual emergency existed and to invalidate any declaration of an emergency which had been made, either by the board or the mayor, if in fact there was no emergency. It is entirely conceivable that either the board or the mayor, or both, could have declared an emergency when none, in fact, existed. In any event, the court is not relieved of its duty to make its own independent inquiry into the facts.

The court's determination that an emergency existed based upon the fact that an illegal strike of public employees was in progress or that the strikers were violating certain court orders does not, necessarily, establish the existence of an emergency. If the illegal strike was one in which only a small number of policemen and firemen were participating and adequate police and fire protection were being furnished to the residents of San Francisco during the strike, then it is possible that the trial court could have found that an emergency did not exist.

Defendants contend, however, that the actual existence of an emergency was admitted by the plaintiff in his verified complaint, wherein he alleged that the policemen and firemen and their unions illegally conspired to strike "with full knowledge and intention that said strikes would result in serious and irreparable damage to the CITY AND COUNTY OF SAN FRANCISCO . . . ." Plaintiff further alleged that the strikes resulted in "almost a complete cessation of police and fire protection for the residents and taxpayers of the CITY AND COUNTY OF SAN FRANCISCO" and personal injury and property damage in an amount yet to be determined. In addition, plaintiff filed an affidavit in support of his complaint and therein alleged that "substantially all members" of both the police and fire departments participated in the strikes with full

knowledge that the strikes were illegal and "with full knowledge and intention that said strikes would result in serious and irreparable damage to the City and County of San Francisco and its residents and taxpayers . . . ." Defendants contend that these allegations established the existence of an actual emergency as a matter of law and that the trial court was correct in so holding.

In reply to these arguments, plaintiff asserts that he should not be bound by the allegations of his original complaint and supporting affidavit because the complaint was filed only one day after the mayor's emergency proclamation and the affidavit only three days later. Plaintiff argues that at the time these documents were filed, he had not had the opportunity, through discovery, to ascertain the true facts. He contends that, since he was subsequently allowed to amend his complaint to allege that no emergency existed at the time of the mayor's proclamation and since he also filed detailed offers of proof in support of this allegation, the question before this court is whether said offers of proof raised a question of fact as to the existence of an emergency. Plaintiff claims that they did, because he alleged therein that the number of policemen and firemen participating in the strikes was relatively small; that enough policemen remained on duty to control all crimes in the City of San Francisco; that 42 percent of the fire department was available for service at the height of the strike; that in fact all police and fire emergencies were adequately handled during the strike; and that both the police and fire departments had developed contingency plans to deal with the strikes and were prepared to obtain the assistance of the highway patrol, national guard, state firefighters and neighboring fire departments. Plaintiff argues that, if proved, these facts would have supported a finding that no actual emergency existed at the time of the mayor's proclamation.

We are not persuaded by plaintiff's position on this point. The amendment to the complaint which plaintiff was permitted to file did not delete any of the allegations of the original verified complaint but merely added the conclusionary allegation that "There was no public emergency when the Mayor proclaimed a public emergency . . . ."

In *Dwan* v. *Dixon* (1963) 216 Cal.App.2d 260 [30 Cal.Rptr. 749], this court was confronted with a similar situation. There, the plaintiff had amended his complaint to add certain conclusionary allegations which contradicted the original allegations of the complaint as well as an affidavit of plaintiff's attorney. We held that a demurrer to the amended

complaint had properly been sustained because the broad allegations contained therein had to be construed in a manner consistent with the averments of the affidavit and, when so construed, failed to state any cause of action against the defendants. We pointed out that "The rule is well established that a complaint good on its face is nevertheless subject to demurrer when facts judicially noticed render it defective. In 2 Witkin, California Procedure, Pleading, section 208, page 1185, the author states: 'The theory is that the pleader should not be allowed to bypass a demurrer by suppressing facts which the court will judicially notice. The principle is that of *truthful pleading,* and is applied for the same reason as in the similar situation of pleaded exhibits which contradict allegations.' In the instant case, appellants' affidavit was a part of the records before the trial court. It is settled that a court may take judicial notice of the contents of its own records. [Citations.] In *Watson* v. *Los Altos School Dist.* (1957) 149 Cal.App.2d 768 [308 P.2d 872], the court upheld the sustaining of a demurrer to the complaint by taking judicial notice of documents which were part of the record on a prior appeal. In so holding, the court stated, 'It would be a travesty on justice were we required to send the case back for a trial that we know would end in but one way . . . No such ridiculous result is necessary.' (P. 771.)" (P. 265.)

Thus, in this case, even if plaintiff had deleted those allegations of the original complaint which were inconsistent with its later amendments, he could not avoid the allegations of the original complaint and the court (as it most assuredly did) could consider those earlier allegations. (*Dwan* v. *Dixon, supra.*)

We hold that, in this instance, the amendment denying the existence of an emergency must be construed in a manner consistent with the more specific factual allegations of the original verified complaint and of the supporting affidavit to the effect that there was almost a "complete cessation of police and fire protection" in San Francisco as a result of the strikes and that "substantially all members" of the police and fire departments participated in the strikes. Police and fire protection are two of the most essential and basic functions of local government. Thus it cannot be denied that when a substantial number of the members of both those departments conduct a strike against the citizens of a highly populated metropolitan area, where serious crimes and fires are a daily fact of life, there is, as a matter of law, a "public emergency involving or threatening the lives, property or welfare of the citizens, or the property of the city and county" within the meaning of section 3.100 of the

charter. Hence, the trial court was correct in so holding, and it would be a travesty on justice for this court to send the case back and direct the taking of evidence on a question which we know could be decided in but one way.

 The sole question remaining on appeal is whether the trial court was correct in determining that the actions taken by the mayor in response to the emergency must be upheld as a matter of law.

As has been pointed out, section 3.100 of the charter provided that in case of a public emergency, the mayor shall have the power and it shall be his duty to do "whatever . . . he may deem necessary for the purpose of meeting the emergency." Thus, it is apparent that this language grants extremely broad powers and discretion to the mayor in a situation where an emergency exists.

In this case, Mayor Alioto's response to the alleged emergency was to grant the policemen and firemen a 13.05 percent salary increase, with the result that the strike was ended and the strikers returned to work. Defendants have correctly pointed out that, in granting this salary increase, the mayor was acting legislatively and that the courts will not interfere with salary legislation in the absence of fraud or action so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law. (*City and County of S. F.* v. *Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666].) It has been held that the courts are not authorized to decide whether discretion in the fixing of the salaries of city employees has been exercised wisely or unwisely. (*Allen* v. *Bowron* (1944) 64 Cal.App.2d 311, 313-314 [148 P.2d 673].)

In the recent case of *City and County of San Francisco* v. *Cooper, supra,* it was alleged that the legislative enactments of certain salary schedules were invalid because they were adopted as a result of a coercive and illegal strike by public employees. Our Supreme Court reaffirmed the rule that the courts cannot nullify a legislative enactment because it was or might have been the result of improper considerations (p. 912) and that legislative judgment and wisdom are reviewable only by the electorate (p. 905) in the absence of some overriding constitutional, statutory or charter proscription (p. 915). The court stated, "In the absence of controlling constitutional, statutory or charter limitations, local legislators retain authority to determine the appropriate legislative response to an allegedly illegal strike. . . . It is, of course, a legislator's prime function to choose between such conflicting policy judgments; in

so doing, he or she is directly responsible to the electorate, not to the judiciary. That legislative role signifies the essence of the doctrine of the separation of powers." (P. 918.)

In this instance, plaintiff and the board of supervisors both admitted in the trial court that they could not offer any proof that Mayor Alioto acted corruptly or for personal gain of any kind when he settled the strike and granted the salary raise to the policemen and firemen. Plaintiff's position, both here and in the trial court, is that Mayor Alioto's actions were improperly motivated because he capitulated to an illegal strike and because he ignored the recommendations of the board of supervisors, which favored alternative measures, and thereby "usurped" the board's power.

The trial court properly determined that such proof would afford no basis for invalidating the mayor's actions. Under the rule of the *Cooper* case, it is clear that the courts may not inquire into improper motives behind local legislation and, in particular, may not consider whether or not legislation was the result of an illegal strike by public employees. It is equally clear that the mayor's decision to respond to the strike in a manner different from that recommended by the board of supervisors constituted a choice between conflicting policy judgments, within the meaning of *Cooper*. The mayor's alleged desire to usurp the power of the board of supervisors is likewise not a subject for judicial inquiry in the absence of an appropriate charter limitation. The San Francisco Charter imposed no such limitation. To the contrary, it empowered the mayor, and not the board of supervisors, to do what he deemed necessary in the case of an emergency. We conclude that the trial court was correct in finding that plaintiff had failed to raise any proper basis for attacking the mayor's actions in response to the emergency.

The purported appeal of the board of supervisors is dismissed, and the judgment is affirmed.

Taylor, P. J., and Kane, J., concurred.